Mr. Justice Harlan
delivered the opinion of the Court.
The Kellogg Bridge Company, which brings this writ of error and was defendant below, undertook to construct, for the Lake Shore and Michigan Southern Railroad Company, an iron bridge across Maumee river at Toledo, Ohio. After doing a portion of the work it entered into a written contract with Hamilton, the defendant in error, for the completion of the bridge under its directions. That contract is the basis of this action, and contains, among others, these stipulations:
“That the said party of the first part [Hamilton] hereby agrees to furnish and prepare all the necessary false work and erect the iron bridge now being constructed by the said party of the second part [the Kellogg Bridge Company] for the Lake Shore and Michigan Southern R. R. Co. at Toledo, Ohio, over the Maumee river, receiving said bridge material as it arrives on the cars at the site of said bridge, and erecting the same in the best manner, according to the design of said bridge and the directions of said second party, from time to time, commencing the erection of said work when required to do so by said second party, and proceeding with the same with a force sufficient to complete the entire work on or before the first day of March next; the said first party also agrees to assume and paylor all work done and materials furnished up to the time *655 of executing this contract, including piling and piles, timber, and other materials and labor done on the same, but not including bolts and washers which have been furnishfed by the party of the second part, but to return said bolts and washers to the said second party, or pay for the same on completion of said bridge.
“And the said first party, in consideration of the payments hereinafter mentioned, to be made by said second party, agrees to perform all the stipulations of this agreement in a thorough and workmanlike manner and to the satisfaction of the second party.
“And if at any time the said second party is not satisfied with the manner of performing the work herein described, or the rapidity with which it is being done, the second party shall have full power and liberty to put on such force as may be necessary to complete the work within the time named, and provide such tools or materials for false work as may be necessary, and charge the cost of the same to the said first party, who agrees to pay therefor.”
In consideration of the faithful performance of these stipulations, Hamilton was to receive from the bridge company $900 on the completion of the first span, a like sum on the completion of the second span, $800 on the completion of the third span, and $1,408 on the completion of the draw and the entire work—such payments to be made only on the acceptance of each part of the work by the chief engineer of the Lake Shore and Michigan Southern Railroad Company.
The bridge which Hamilton undertook to erect consisted of three independent fixed spans, each to be one hundred and seventy-five feet six inches in length, suspended between and resting at each end of the span upon stone piers, which had been prepared to receive the same, and one draw span of one hundred and eighty-five feet in length, resting upon a pier in the center, also then prepared. In erecting the several spans it was necessary to build and use what the contract describes as “false work,” which consisted of piles driven in the river between the piers upon which the spans were to rest, and upon which was placed a platform.
As indicated in the written contract, the bridge company had previously constructed a part of this false work between the first and second spans, the cost of which Hamilton paid, as by the contract he agreed to do. Assuming this work to be suffi *656 cient for the purposes for which it was designed, Hamilton proceeded to complete the erection of the bridge according to the plans furnished him.
There was evidence before the jury tending to establish the following facts:
A part of the false work or scaffolding put up by the company sank under the weight of the first span, and was replaced by Hamilton. When the second fixed span was about two-thirds completed, the ice, which before that had formed in the river, broke up in consequence of a flood, carrying away the false work under that span, and causing the whole of the iron material then in place on the span, or on the span ready to be put in place, to fall in the river, which at that place was about sixteen feet deep. If the piles driven by the bridge company had been driven more firmly into the bed of the river, they would have withstood the force of the ice and flood. In consequence of the insufficiency of the false work done by that company, Hamilton was delayed in the completion of the bridge and subjected to increased expense.
In this action his claim is that the company is liable, not only for the.amount specified in the contract, but also for such damages as he sustained by reason of the insufficiency of the false work it constructed. Charging defendant with these amounts, and crediting it with such sums as had been paid to or for Hamilton, a balance of $3,693.78 was claimed to be due the latter. Defendant, by way of counter claim, asked judgment against .Hamilton for $6,619.70. ‘There was a verdict and judgment in favor of plaintiff for $3,039.89.
It is insisted by the defendant in error that the value of the matter really in dispute here is less than the amount requisite to give this Court jurisdiction. Upon this ground a motion to dismiss was heretofore made, and was denied. To that ruling we adhere. Upon the pleadings it is.apparent that the defendant asserts its right to judgment for $6,619.70 after crediting plaintiff, not only with the sum specified in the contract, but with every other sum to which he is entitled in the accounting. This is conclusive as to our jurisdiction upon this writ of error.
It was not claimed on the trial, nor is it contended here, that the company made any statement or representation as to the *657 nature or character of the false work it did, and which by the contract, Hamilton agreed to assume and pay for. But there was evidence tending to show that the insufficiency of that false work was unknown to Hamilton at the time the contract was made ; was not apparent upon any examination he then, or could have, made; and was not discovered, indeed, could not have been discovered, until, during the progress of the erection of the bridge, the false work was practically tested.
The Court, among other things, instructed the jury, at the request of plaintiff, and over the objections of the defendant, that by the contract—looking at all the circumstances attending its execution and giving to its terms a fair and reasonable interpretation—there was an implied warranty upon the part of the company that the false work it did, and which plaintiff agreed to assume and pay for, was suitable and proper for the purposes for which the bridge company knew it was to be used. This instruction was accompanied by the observation that if the evidence showed “that the particular work which was said to be defective was such that the plaintiff could not by examination ascertain its defects—for if they were apparent by mere examination of the false work, it was the duty of the plaintiff to make that good—he had the right to rely upon the implied warranty; that is, if the defects were such that they could not be, by ordinary observation and care on behalf of the plaintiff, ascertained and found out.” That instruction presents the only question we deem necessary to determine. Although there are several assignments of error, they depend, as counsel for plaintiff in error properly concede, upon the inquiry whether the Court erred in ruling that by the terms of the contract there was an implied warranty that the false work constructed by the bridge company was suitable and proper for the purposes for which it was to be used by Hamilton.
The argument in behalf of plaintiff in error proceeds upon the ground that there was a simple transfer by the company of its ownership of the work and materials as they existed at the time of the contract; that Hamilton took the false work for what it was, and just as it stood; consequently, that the rule of caveat emptor applies with full force. The position of counsel for Hamilton is that, as in cases of sales of articles by those manufacturing or making them, there was an implied war *658 ranty by the bridge company that the work sold or transferred to Hamilton was reasonably fit for the purposes for which it was purchased.
The cases in which the general rule of caveat emptor applies are indicated in Barnard v. Kellogg, 10 Wall., 388, where, speaking by Mr. Justice Davis, the Court observed, that “ no principle of the common law has been better established, or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of caveat emptor applies.”
An examination of the ground upon which some of the cases have placed the general rule, as well as the reasons against its application, under particular circumstances, to sales of articles by those who have manufactured them, will aid us in determining how far the doctrines of those cases should control the one before us.
The counsel for the bridge company relies upon Parkinson v. Lee, 2 East, 314, as illustrating the rule applicable in ordinary sales of merchandise. That case arose out of a sale of five pockets of hops, samples of which were taken from each pocket and exhibited at the time of sale. The question was whether, under the circumstances of that case—there being no express warranty and no fraud by the seller—there was an implied warranty that the commodity was merchantable. It was resolved in the negative upon the ground that it was the fault of the buyer that he did not insist on a warranty; the commodity was one which might or might not have a latent defect, a fact well known in the trade; and since a sample was fairly taken from the bulk, and the buyer must have known, as a dealer in the commodity, that it was subject to the latent defect after-wards appearing, he was held to have exercised his own judgment and bought at his own risk. But of that case, it was observed by Chief Justice Tindal, in Shepherd v. Pybus, 3 Man. & Gr., 880, that two of the Judges participating in its decision laid “ great stress upon the fact that the seller was not the grower of the hops, and that the purchaser, by the inspection of the hops, had as full an opportunity of judgment of the *659 quality of the hops as the seller himself.” There was, consequently, nothing in the circumstances to justify the. buyer in relying on the judgment of the seller as to the quality of the commodity. It is, also, worthy of remark, that in Randall v. Newson, 2 Q. B., 116, it was said of Parkinson v. Lee, that “ either it does not determine the extent of the seller’s liability on the contract, or it has been overruled.”
In Brown v. Edgington, 2 Man. & Gr., 371, the plaintiff sought to recover damages resulting from the insufficiency of a rope furnished by the defendant upon plaintiff’s order, to be used, as defendant knew, in raising pipes of wine from a cellar. The defendant did not himself manufacture the rope, but procured another to do so, in order that he, defendant, might furnish it in compliance with plaintiff’s request. Tindal, C. J., said : “ It appears to me to be a distinction well founded, both in reason and on authority, that if a party. purchases an article upon his own judgment, he cannot afterwards hold the vendor responsible, on the ground that the article turns out to be unfit for the purpose for which it was required; but if he relies upon the judgment of the seller, and informs him of the use to which the article is to be applied, it seems to me the transaction carries with it an implied warranty that the thing furnished shall be fit and proper for the purpose for which it was designed.”
In Shepherd v. Pybus, already referred to, the question was, whether upon the sale of a barge by the builder, there was a warranty of fitness for the purpose for which it was known by the builder to have been purchased. It was held that the law implied such a warranty. The ground of the decision was, that the purchaser had no opportunity of inspecting the barge during.its construction, having seen it only after completion; that the defects afterwards discovered were not apparent upon inspection, and could only be detected upon trial.
In Jones v. Just, L. R., 3 Q. B., 203, upon an extended review of the authorities, the Court classified the adjudged cases bearing upon the subject of implied warranty, and said that “it must be taken as established that on the sale of goods by a manufacturer or dealer to be applied to a particular purpose, it is a term in the contract that they shall reasonably answer that purpose, and that on the sale of an article by a manufac *660 turer to a vendee who has not had the opportunity of inspecting it during the manufacture, that it shall be reasonably fit for use or shall be merchantable, as the case may be.”
Other cases might be cited, but these are sufficient to show the general current of decision in the English Courts.
The decisions in the American Courts do not indicate any substantial difference of doctrine. A leading case upon the subject, where the authorities were carefully examined and distinguished, is Hoe v. Sanborn, 21 N. Y., 552. The decision there was, that “where one sells an article of his own manufacture which has a defect produced by the manufacturing process itself, the seller must be presumed to have had knowledge of such defect, and must be holden, therefore, upon the most obvious principles of equity and justice—unless he informs the purchaser of the defect—to indemnify him against it.” In Cunningham v. Hall, 4 Allen, 273, the cases of Hoe v. Sanborn, and Shepherd v. Pybus, and Brown v. Edgington, ubi supra, are cited with approval. In Rodgers v. Niles, 11 Ohio St., 53, the Supreme Court of Ohio recognizes among the exceptions to the general rule cases “where it is evident that the purchaser did not rely on his own judgment of the quality of the article purchased, the circumstances showing that no examination was possible on his part, or the contract being such as to show that the obligation and responsibility of ascertaining and judging of the quality was thrown upon the vendor, as where he agrees to furnish an article for a particular, purpose or use.” So in Leopold v. Vankirk, 27 Wis., 154: “The general rule of law with respect to implied warranties is well settled that when the manufacturer of an article sells it for a particular purpose, the purchaser making known to him at the time the purpose for which he buys it, the seller thereby warrants it fit and proper for such purpose and free from latent defects.” So also in Brenton v. Davis, 8 Blackf., 318: “We consider the law to be settled, that if a manufacturer of an article sells it at a fair market price, knowing the purchaser designs to apply it to a particular purpose, he impliedly warrants it to be fit for that purpose; and that if owing to some defect in the article, not visible to the purchaser, it is unfit for the purpose for which it is sold and bought, the seller is liable on his implied warranty.” 2 Story on Contracts, Sec. 1077, 5th Edit., by Bige *661 low; 1 Cliitty on Contracts, 11th American Edit., 631-2, note to; Addison on Contracts, Ch. 7, Sec. 1, p. 212.
The authorities to which we have referred, although differing in the form of stating the qualifications and limitations of the general rule, yet indicate with reasonable certainty the substantial grounds upon which the doctrine of implied warranty has been made to rest. According to the principles of decided cases, and upon clear grounds of justice, the fundamental inquiry must always be, whether under the circumstances of the particular case, the buyer had the right to rely and necessarily relied on the judgment of the seller and not upon his own. In ordinary sales the buyer has an opportunity of inspecting the article sold; and the seller not being the maker, and therefore having no special, or technical knowledge of the mode in which it was made, the parties stand upon grounds of substantial equality. If there be, in fact, in the particular case, any inequality, it is such that the law cannot or ought not to attempt to provide- against; consequently, the buyer in such cases—the. seller giving no express warranty and making no representations tending to mislead—is holden to have purchased entirely on his own judgment. But when the seller is the maker or manufacturer of the thing sold, the fair presumption is, that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process, and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manufacturer or maker, by his occupation holds himself out as competent to make articles reasonably adapted to the purposes for which such or similar articles are designed. When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects, of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it *662 was designed, the seller at the time being informed of the purpose to devote it to that use.
Whether these principles control, or to what extent they are applicable, in the present case, we proceed to inquire.
Although the plaintiff in error is not a manufacturer in the common acceptation of that word, it made or constructed the false work which it sold to Hamilton. The transaction, if not technically a sale, created between the parties the relation of vendor and vendee. The business of the company was the construction of bridges. By its occupation, apart from its contract with the railroad company, it held itself out as reasonably competent to do work of that character. Having partially executed its contract with the railroad company, it made an arrangement with Hamilton, whereby the latter undertook, among other things, to prepare all necessary false work, and, by a day named, and in the best manner, to erect the bridge then being constructed by the bridge company—Hamilton to assume and pay for such work and materials, as that company had up to that time done and furnished. Manifestly, it was contemplated by the parties that Hamilton should commence where the company left off. It certainly was not expected that he should incur the expense of removing the false work put up by the company and commence anew. On the contrary, he agreed to assume and pay for, and, therefore, it was expected by the company that he should use, such false work as it had previously prepared. It is unreasonable to suppose that he would buy that which he did not intend to use, or that the company would require him to assume and pay for that which it did not expect him to use, or which was unfit for use. It is suggested that, as Hamilton undertook to erect the bridge in a thorough and workmanlike manner, he was not bound to use the false work put up by the company, and that if he used it in execution of his contract, he did so at his own risk. This is only one mode of saying that, in the absence of an express warranty or fraud upon the part of the company, the law will not, under any circumstances, imply a warranty as to the quality or sufficiency .of this false work. But the answer to this argument is, that no question was raised as to its sufficiency; that, while Hamilton must be charged with knowledge *663 of all defects apparent or discernible upon inspection, he could not justly be charged with knowledge of latent defects which no inspection or examination, at or before the sale, could possibly have disclosed. The jury have, in effect, found the false work to have been insufficient, in that the piles were not driven deep enough; that had they been properly driven, the work would have answered the purposes for which Hamilton purchased it; and that he could not have ascertained such defects in advance of an actual test made during the erection of the bridge. It must be assumed that the company knew, at the time of sale, that Hamilton could n'ot, by inspection, have discovered the latent defects which were subsequently disclosed. And if it be also assumed, as it fairly may be, that Hamilton, being himself a bridge builder, knew that there might be latent defects in this false work, caused by the mode of its construction, and beyond his power by mere inspection to ascertain, it must not be overlooked that he also knew that the company, by its agents or servants, were or should have been informed as to the mode in which the work had been done. That he did not exact an express warranty against latent defects, not discoverable by inspection, constitutes, under the circumstances, no reason why a warranty may not be implied against such defects as were caused by the mode in which this false work was constructed. In the cases of sales by manufacturers of their own articles for particular purposes, communicated to them at the time, the argument was uniformly pressed that, as the buyer could have required an express warranty, none should be implied. But, plainly, such an argument impeaches the whole doctrine of implied warranty, for there can be no case of a sale of personal property in which the buyer may not, if he chooses, insist on an express warranty against latent defects.
All the facts are present which, upon any view of the adjudged cases, must be held essential in an implied warranty. The transaction, was, in effect, a sale of this false work, constructed by a company whose business it was to do such work ; to be used in the same way the maker intended to use it, and the latent defects in which, as the maker knew, the buyer could not, by any inspection or examination at the time discover; the buyer did not, because in the nature of things he could not, *664 rely on his own judgment; and, in view of the circumstances of the case, and the relations of the parties, he must be deemed to have relied on the judgment of the company, which alone of the parties to the contract had or could have knowledge of the manner in which the work had been done. The law, therefore, implies a warranty, that this false work was reasonably suitable for such use as. was contemplated by both parties. It was constructed for a particular purpose, and was sold to accomplish that purpose; and it is intrinsically just that the company, which held itself out as possessing the requisite-skill to do work of that kind, and, therefore, as having special knowledge of its own workmanship, should be held to indemnify its vendee against latent defects, arising from the mode of construction, and which the latter, as the company well knew, could not, by any inspection, discover for himself.
For the reasons stated, we are of opinion that the Court did not err in the law of the case, and the judgment must be

Affirmed.