EGBERT et al. v. HANFORD PRODUCE CO.

(Supreme Court, Appellate Division, First Department. March 11, 1904.)

1. SALES—QUALITY OF GOODS—IMPLIED WARRANTY.

Defendant sold eggs to plaintiffs in New York. The eggs were in cold storage in defendant's warehouse in Iowa. The defendant knew the quality, and represented them to be "fancy selected eggs in storage." The defendant knew plaintiffs were relying on its representations as to the quality, and that plaintiffs had no representative in Iowa. *Held*, that defendant's representation as to the quality of the goods was a warranty.

2. SAME—QUESTION FOR JURY.

Where eggs are sold on a warranty that they are "fancy selected eggs in storage," and the evidence is conflicting as to whether they were of the quality warranted, the question is one for the jury.

3. SAME—SEPARATE ALLOTMENTS—RIGHTS OF BUYER.

Where several lots of eggs are sold from as many different localities, on a warranty that they are of a certain quality, the buyer has the right to rely on the warranty, order all the eggs delivered, and look to the seller for any damages sustained by a breach.

4. SAME—MEASURE OF DAMAGE.

Where eggs are sold on a warranty that they are of a certain quality, the measure of damage for a breach of the warranty is the difference between the price the eggs brought on resale by the buyer and that which they would have brought had the quality been as represented by the seller.

Appeal from Trial Term.

Action by Thomas K. Egbert and another against the Hanford Produce Company. From a judgment for plaintiffs and an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

George C. Delacy, for appellant.
Charles I. McBurney, for respondents.

McLAUGHLIN, J. This action was brought to recover damages for an alleged breach of warranty in the sale and delivery by defendant to the plaintiffs of a quantity of eggs.

The material allegations of the complaint upon which a recovery was sought were that the defendant, an Iowa corporation, on or about the 20th of April, 1899, offered to sell to the plaintiffs, for $9,000, five car loads of eggs, which it warranted to be selected storage eggs, a quality known to the trade as "storage firsts"; that the plaintiffs, relying upon this warranty, and believing the same to be true, purchased five car loads, consisting of 60,000 dozen, for which they paid the price asked by defendant; that the same did not come into plaintiffs' posses-

sion at the time of the purchase, nor when payment was made, but were held by defendant, as warehouseman of these plaintiffs, at Sioux City, Ia.; that thereafter plaintiffs directed defendant to ship the same to their place of business in the city of New York, which it did, and upon inspection it was ascertained that the eggs were not selected storage eggs of the quality warranted and known to the trade as "storage firsts," but were of a much inferior quality, of which fact defendant was immediately notified, and at the same time plaintiffs offered to return the eggs to the defendant or dispose of them as it might direct; that the defendant refused to receive the eggs or give any directions as to their disposition, and they were thereupon sold in the open market, previous notice of such sale having been given to the defendant; and judgment was demanded for the difference between what they brought on such sale and what they would have brought had they been of the quality represented.

The answer admitted the sale; payment of the purchase price; that the eggs were stored, after the purchase, by defendant in its cold-storage warehouse at Sioux City, Iowa, and warehouse receipts issued therefor; and denied the other material allegations of the complaint; as a separate defense alleged that at the time stated in the complaint the defendant sold to the plaintiffs, at the price stated therein, 60,000 dozen of "fancy selected eggs in storage," and at plaintiffs' request the same were placed in cold storage "to await the orders and disposition of plaintiffs concerning the same"; that, the eggs having been put in cold storage, the defendant issued its warehouse receipts covering the same; that said eggs were, at the time of the sale and deposit, of the kind, character, and quality called for by the contract of sale; that they remained in defendant's cold-storage warehouse until the 25th day of November, 1899, at which time, and at sundry dates thereafter prior to the 8th day of January, 1900, defendant, at plaintiffs' request, shipped all of said eggs in five separate car loads to plaintiffs in the city of New York; and that if, at the time of the receipt by plaintiffs, said eggs did not grade as "fancy selected eggs," it was through no fault of defendant, but was due entirely to the length of time during which plaintiffs had kept said eggs in storage.

Upon the issue thus formed the parties went to trial, where substantially the only fact litigated was whether the eggs were of the quality represented at the time the purchase was made. There was no real dispute as to the terms of the contract. The eggs sold were five car loads of selected storage eggs. The contract was made in April, when the storage of eggs begins, and was for selected eggs, known as "storage firsts." This was not only established by the witnesses on the part of the plaintiffs, but by the invoice, the warehouse receipts, and also by the defendant's witness Hanford—the person who made the sale—who testified that they were to be "fancy selected eggs in storage"; that they "were to be the usual high quality of Hanford storage eggs"; as well as by the testimony of the president and warehouseman of the defendant (which was taken by commission), to the effect that the eggs were to be "fancy storage packed Aprils," known as "fancy selected storage eggs," a quality considered by him "second to none." Nor was there any dispute between them as to the effect of

storage upon eggs of the quality contracted for. The general manager of the defendant testified that selected storage eggs stored the length of time that the eggs in question were do not deteriorate in quality in storage, except that there is a slight evaporation.

Upon the question of quality it appeared that the first car load—one fifth of the total amount—was delivered about the 1st of December, 1899, and the other four car loads between that date and the 8th of January following; that immediately upon delivery of each car load the eggs were inspected by plaintiffs' manager, the official egg inspector of the New York Mercantile Exchange, and others, all persons experienced in the business and competent to pass upon the quality of eggs, who substantially agreed that the eggs were "storage seconds," a quality inferior to "storage firsts," and were not of the grade known as "selected April storage eggs." On the part of the defendant the witness Hanford testified that he saw the first car and inspected the eggs; that they were of the usual high quality of Hanford packed, and were of the quality sold. It appears, however, that he did not examine the other four cars, nor did the defendant have any one else examine them, although afforded an opportunity to do so. The president of the defendant testified that the eggs were "fancy storage packed Aprils," but, in answer to a cross-interrogatory, stated in substance that he had nothing personally to do with the selection of the eggs, and defendant's warehouseman, whose testimony was taken by commission, also stated that the eggs were selected storage packed April eggs, but, in answer to a cross-interrogatory, said he did not personally make any selection of the eggs—that such selection was made by a force of from 20 to 60 hands, under the direction of the superintendent.

This being the condition of the evidence at the close of the trial, we think the court could not do otherwise than submit the case to the jury to pass upon the question involved, viz., whether the eggs were of the quality contracted to be sold. The jury rendered a verdict for $1,800, the difference between what the eggs brought on the sale and what they would have brought had they been of the quality represented, and from the judgment entered thereon the defendant has appealed.

I think the trial court correctly held, upon the facts presented, that under the terms of the contract there was a warranty on the part of the defendant as to the quality of the eggs. The rule seems to be well settled that upon a sale of personal property, where inspection of it is not possible at the time, and the seller knows the quality and the buyer does not, the representations made by the seller as to the quality are to be regarded as a warranty. White v. Miller, 71 N. Y. 118, 27 Am. Rep. 13; Carleton v. Lombard, 149 N. Y. 137, 43 N. E. 422; Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 3 Sup. Ct. 537, 28 L. Ed. 86. Here, the sale was made in New York. The eggs were in defendant's warehouse at Sioux City, Iowa. The defendant knew the quality, and represented them to be "fancy selected eggs in storage." The defendant knew that the plaintiffs were relying upon its representations as to quality because they had no representative at Sioux City, and, if they had, it is difficult to see how an inspection—the eggs being then in storage—could have been made. The evidence shows that eggs when placed in storage retain their quality, except for a slight evaporation,

and the evidence is sufficient to sustain the finding that the eggs when delivered were not of the quality purchased.

But it is said that the plaintiffs ascertained the quality of the eggs when the first car load was received, and therefore they are not in a position to recover, inasmuch as they thereafter ordered the other car loads sent forward. I am unable to see any force in this contention. It would hardly be claimed, if the first car load had proved satisfactory and been accepted, that the plaintiffs would thereby have been bound to accept the other four car loads, even though of an inferior quality. Nor do I think the plaintiffs would have been justified in rejecting all of the eggs because the first car load proved to be unsatisfactory. The eggs were composed of five separate lots, for which five distinct warehouse receipts were given, each having a separate number, which indicated where stored, and each lot was separately insured. The plaintiffs did not have a right to assume, under such circumstances, that all of the eggs were inferior in quality because the first car load was. But whether this conclusion be correct or not, if there was a warranty, then the plaintiffs had a right to rely upon it, order all of the eggs delivered, and look to the defendant for any damages which they might sustain for a breach of the warranty. Pierson v. Crooks, 115 N. Y. 529, 22 N. E. 349, 12 Am. St. Rep. 831.

Other questions are raised by the appellant as to the admission of evidence. An examination of the record fails to disclose any errors in this respect. Nor was any error committed in the instructions given to the jury. All of defendant's requests to charge, with one exception, were granted, and that was properly refused. It was: "The defendant is entitled to a verdict, and the jury must decide accordingly." From what has been said, it is clear that instructions to this effect would have been error. It was for the jury to determine from all of the facts, under the rule of law laid down by the trial court, whether or not there was a breach of warranty. The measure of damages adopted was the correct one. It was the difference between what the eggs brought on the sale and what they would have brought had the quality been as represented. This was less than the difference between the price paid and what was realized, the plaintiffs having to stand the loss by reason of the depreciation of the market price.

It follows that the judgment and order appealed from must be affirmed, with costs. All concur.