[No. 11311.  Department One.  April 29, 1914.]

HURLEY-MASON COMPANY, *Respondent*, v. STEBBINS,
WALKER & SPINNING, *Appellant*.[1]

SALES—PERFORMANCE OR BREACH—TESTS—DUTY TO MAKE TESTS
—CONTRACT—CONSTRUCTION.  A contractor purchasing cement from
dealers subject to specified tests, assumed the duty of making the
tests, where the cement was to be used in the construction of a
depot under a contract obligating the contractor to use no cement
which did not meet the tests, which were to be made by a firm ap-
proved by the architects, at the mill or at the site, at a cost of
five cents per barrel to be paid by the railway company, and the
contract of purchase required delivery "f. o. b. cars, St. Paul, Minne-
sota," and that all claims of the purchaser upon the seller must be
made within five days, the cement never being in the possession of
the dealers who had no opportunity to make the tests.

SAME—TESTS—TIME FOR MAKING.  No time being specified in the
contract of sale for making the tests, the contractor had only a
reasonable time after delivery for making the tests, which must be
before use.

SALES—SUBJECT TO TESTS—WARRANTY—CONDITION PRECEDENT.  A
provision in a contract for the sale of cement that the same shall
be subject to tests to be made by the purchaser is not a warranty of
quality collateral to the contract, but is a condition precedent to ac-
ceptance, placing the consequence of failure to make the tests upon
the purchaser.

SALES—PERFORMANCE OR BREACH—CONDITIONS—TESTS—WAIVER OF
DEFECTS.  Upon an executory sale of goods subject to inspection,

[1]Reported in 140 Pac. 381.

an acceptance by the buyer, with or without inspection and without notice to the seller of the defects, is a waiver of any claim for damages on account of defects which might have been discovered upon inspection, in the absence of an express warranty intended to survive acceptance.

SALES—SUBJECT TO TESTS—IMPLIED WARRANTY—SALE BY DEALERS. Upon an executory sale of cement by dealers to a contractor, subject to specified tests to be made by the contractor, there is no implied warranty that the cement would be fit for the purposes for which it was intended, where any defects were discoverable by application of the tests; there being a distinction between executory sales by dealers and executory sales by manufacturers.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered December 28, 1912, upon findings in favor of the plaintiff, in an action on contract, tried to the court. Reversed.

*B. S. Grosscup* and *W. C. Morrow,* for appellant.

*T. L. Stiles,* for respondent.

ELLIS, J.—Action to recover damages for an alleged breach of an executory contract for the sale of cement. The plaintiff had a contract with the Northern Pacific railway company to construct a passenger station in the city of Tacoma, in accordance with certain plans and specifications. Much of the work consisted of reinforced concrete walls which the plaintiff's contract with the railway company required should be built of Portland cement, of a quality specified in the contract, as follows:

"Cement, when not otherwise specified, shall be Portland of the Vulcanite, Atlas, Lehigh, Alpha, Saylor or other brands, from approved manufacturers, that will fulfill the standard tests of the architects. It shall be inspected by a firm approved by the architects, either at the mill or at the site, and five (5) cents per barrel shall be allowed by the contractor for this inspection."

Then follow tests substantially the same as those hereinafter set out in the plaintiff's order for the cement from the

defendant. The contract for the purchase of the necessary cement is evidenced by the following written order, counter offer, and acceptance:

"Aug. 20, 1909.

"Messrs. Stebbins, Walker & Spinning, Tacoma, Wash.

"Gentlemen:—We herewith confirm our order for fifteen thousand barrels or more of Atlas cement to be delivered to us in the care of the Northern Pacific railroad at St. Paul, for $1.40 per. barrel less 30c per barrel for empty sacks. This cement is purchased subject to the following tests as specified by the architects for the Tacoma depot:

    (b) Tests.

        (1) Fineness: On No. 100 sieve of 10,000 meshes per square inch (Stubbs wire gauge) 92% must pass through.

        (2) Initial Set: Initial set as determined by time required for cake of plastic neat cement to bear wire $\frac{1}{2}$ inch diameter loaded to weigh four ounces without appreciable imprint, shall not be less than 45 minutes from time of adding water.

        (3) Final Set: Final set as determined by the time required for cake of plastic neat cement to bear 1-24 inch diameter loaded to weigh one pound without appreciable imprint, shall not be more than five hours from time of adding water.

        (4) Soundness: Cold water test. Pats of plastic paste about three inches in diameter by $\frac{1}{2}$ inch thick at center with thin edges, kept in moist air until final set and for the balance of 28 days in water of temperature approximately 65 degrees Fahr. shall not crack, warp nor soften.

        (5) Neat Tensile Test: Briquets of cement paste mixed five minutes with minimum amount of water necessary to make mortar thoroughly soft and plastic at the end of 24 hours, break at not less than 125 lbs. per square inch and at the end of 7 days, break at not less than 400 lbs. per square inch.

"Please wire immediately and have the company ship 1,000 barrels at once.        Yours truly,

"Hurley-Mason Company,
"By Chas. B. Hurley.

"Tacoma, Sept. 21, 1909.

"Hurley-Mason Co., City.

"Gentlemen:—As per verbal agreement between your Mr. Hurley and the writer, we propose to deliver to you Atlas Portland Cement under the following conditions:

"The Hurley-Mason Co. shall be known as the purchaser and Stebbins, Walker & Spinning shall be known as the seller in the following paragraphs:

"First: The seller agrees to furnish the purchaser and said purchaser agrees to accept from the seller the Atlas Portland Cement herein specified in the quantity of fifteen thousand (15,000) barrels to be delivered as hereinafter set forth. It being understood and agreed between the parties herein that the seller is to be under no obligation to make shipment in excess of five thousand (5,000) barrels in any one month. Shipment of cement herein specified to be made in carload lots. Entire quantity required to be ordered forward in time for shipment prior to April 1st, 1910 . . .

"Second: That the seller will furnish under this contract Atlas Portland Cement that will conform to the requirements of the specifications covered by your letter of August 20th, 1909, to the seller which becomes a part of this contract. All claims of the purchaser upon the seller must be made in writing, and filed with the seller within five (5) days after the cement is received; failure to file a claim within the time allowed will be acknowledgment by the purchaser of the receipt of the cement in good condition and in the quantity specified in the bill of lading and invoice.

"Third: That the seller will furnish Atlas Portland Cement required under this agreement at the following price, to wit: f. o. b. cars, St. Paul, Minn., one dollar forty-five cents ($1.45) per barrel in cloth bags.

"Fourth: That the seller will purchase Atlas cloth bags at seven and one-half cents each, subject to the following conditions: [No question arises from the conditions which follow. We omit them.]

"Yours very truly,
            "Stebbins, Walker & Spinning,
                 "Per L. R. Walker.

"The purchaser agrees to accept from the seller Atlas Portland cement subject to the conditions set forth above.
                 "Hurley-Mason Co.,
                      "By Chas. B. Hurley, Prest."

The defendant began delivering the cement about the middle of September, the same being tested at the mill of the Atlas Cement Company, the manufacturer, at Hannibal, Missouri, by Hunt and Company, the testers approved by the architects of the railroad company under the plaintiff's contract with the railroad company. It appears that the plaintiff made no tests at all, but relied upon the tests made by Hunt and Company at the mill. By the latter part of November, about 2,500 barrels of cement had been accepted and used on the work with satisfactory results. About November 20, the plaintiff claims that it used about 444 barrels of the cement then arriving in Tacoma which, upon pouring the concrete into the forms, would not set soon enough, and, though allowed to remain until December 7, never solidified. On the latter date, by order of the inspector for the railway company on the work, this concrete was taken out. At about the time that this cement was being used, the plaintiff received a telegram from the engineer for the railway company stating that three carloads of cement had been shipped without testing. The remainder of the cement then on hand being under suspicion, which, it seems, was about 600 barrels, was loaded onto cars, sent to the Commercial dock in Tacoma, where subsequently samples were taken from it for the purpose of making tests on behalf of the various persons interested, namely, the railway company, the plaintiff, the defendant, and the Atlas Cement Company, the manufacturer. The evidence details the manner in which those samples were taken and the results of the tests made by different experts for the various interests represented in the transaction. These tests did not agree. The plaintiff claims that this evidence showed that the cement in question did not meet the tests prescribed in the contract, while the defendant claims exactly the contrary.

The plaintiff claimed damages in the sum of $4,114.66, including the cost of new cement, sand and gravel used in replacing the concrete taken out, the labor of tearing it out,

the expense of building new forms, charges for superintendence, use of plant, insurance, wages of watchman and timekeeper, and freight paid upon the cement used in the concrete taken out and also on the cement ordered off the work, and the cost of testing. The plaintiff also claimed $2,339.62 for sacks returned to the defendant not paid for. Against this, the plaintiff admitted that the defendant has a valid offset of $2,900 for 2,000 barrels of cement furnished. The court made findings in favor of the plaintiff and entered judgment against the defendant in the sum of $3,520.91, with costs. The defendant appeals.

In our discussion we shall proceed upon the assumption that the cement, for the damages occasioned by the use of which the respondent sued, would not have met the tests prescribed in the contract at the time it was delivered to the respondent at Tacoma. We shall assume that this was sufficiently shown by the tests of the remainder of the cement made after the rejection of the work by the railroad company's architect. Such was the effect of the court's finding. The view which we take of the law of the case makes it unnecessary to review the evidence upon which this finding was based.

On the law of the case, appellant contends that the facts do not establish a warranty, but merely a sale of cement to be accepted upon a test by the purchaser. The respondent contends that the judgment should be sustained upon two elements of warranty; an express warranty that the cement would comply with the five tests specified in the contract, and an implied warranty that the cement would be reasonably fit for the known purpose for which it was purchased. These contentions present three questions, the solution of which must be determinative of this case. They are these: (1) Upon whom, as between appellant and respondent, was the duty of making the tests, and when and where? (2) Was the provision that the sale was subject to the given tests a warranty collateral to the contract, surviving acceptance of

the cement, or was it a condition of the contract, satisfied by acceptance? (3) Was there any implied warranty that the material would be fit for the purpose for which it was purchased?

I. In determining who, as between the appellant and respondent, was to make the tests and when and where the tests should have been made, we must look to the terms of their contract and to the situation of the parties and of the subject-matter. The contract provided: "This cement is purchased subject to the following tests as specified by the architects for the Tacoma depot." The five specified tests are then set out. These words were the words of the respondent. They were contained in its order. They were used for its own protection and must be construed with reference to that purpose. The respondent knew that it was obligated to use no cement that would not meet these tests. It knew that it was obligated by its contract with the railway company to pay for an inspection by the application of these tests at the rate of five cents a barrel. It knew that, under its contract with the railway company, these tests were to be made "either at the mill or at the site" of the depot "by a firm approved by the architects." It knew that an inspection by the appellant would not be binding upon the railway company and would be no protection to the respondent. It therefore purchased the cement subject to the tests for which it was already, and in any event, obligated to pay. On the other hand, the appellant was not a manufacturer but a dealer. The contract was executory. The cement was not at hand. It is fairly inferable that it was not then even in existence. The cement was not in the appellant's possession and both parties knew that it never would be prior to its delivery to the respondent. Respondent knew that the cement was to be made at the mill of the Atlas Portland Cement Company, at Hannibal, Missouri, and furnished to the respondent "f. o. b. cars St. Paul, Minn." The appellant would have no opportunity to test the cement. It, there-

fore, sold "subject to" the tests specified, which is a very different thing from an agreement to make the tests itself. A sale of an article subject to inspection or test is a very different thing from the sale of an inspected or tested article. In the absence of stipulation to the contrary, the one places the duty of inspection or test upon the purchaser prior to acceptance and use, and the other places that duty upon the seller prior to delivery. When the terms and purpose of the contract, the situation of the parties and of the subject-matter are considered, there can be no question that the respondent assumed the duty of making the tests. In practice it made the inspector approved by the railway company's architect its agent for the inspection.

As to the place of the tests, it is obvious that the respondent could select its own place. The appellant could not insist upon these tests being made prior to its delivery of the cement to the respondent. To that extent, it took the risk of the rejection of the cement after its delivery. The respondent, however, could not select its own time for making the tests. No time being specified in the contract, it had only a reasonable time after delivery. It was certainly contemplated that the tests should be made before the use of the cement, since it is obvious that the use of the cement would render the specified tests impossible. The appellant contends that those tests should have been made within five days after the cement was received, because the contract provides that all claims of the purchaser upon the seller must be made within that time. This provision, however, applied only to the condition in which the cement was received, not to its quality. It could not apply to a failure to meet the tests, since some of the tests required a longer time than five days for the making.

II. Was the provision that the sale was subject to the tests a warranty collateral to the contract, or was it a condition of the contract? The respondent contends that it was a warranty of quality. We do not so construe it. The

sale was made "subject to" the tests.  If an inferior article was shipped, the respondent had a reasonable time for inspection and test, and an acceptance or refusal to accept. The sale being subject to the tests, if the material delivered did not meet the tests, then there was to be no sale.  This is a very different thing from a collateral undertaking that all cement delivered should meet the tests.  A sale subject to inspection should never be construed as a warranty against defects which the inspection contemplated would disclose. Much confusion will be avoided by observing this distinction, which inheres in the very nature of the undertaking on the one hand, and in the remedy for its breach on the other.  Respondent admits that "the mention of tests in the contract was nothing more than a further description of the required quality."  This is true so far as it goes, but it also furnished the specific means to the respondent to determine that fact prior to acceptance.  Benjamin on Sales, after pointing out the fact that much confusion has arisen from the habit of treating conditions precedent as warranties, quotes from Lord Abinger as follows:

"A warranty is an express or implied statement of something which a party undertakes shall be part of a contract, and, though part of the contract, *collateral to the express object of it.*  But in many of the cases, the circumstance of a party selling a particular thing by its proper description has been called a warranty, and the breach of such a contract a breach of warranty; but it would be better to distinguish such cases as a noncompliance with a contract which a party has engaged to fulfill."

The author adds:

"There can be no doubt of the correctness of the distinction here pointed out.  If the sale is of a described article, the tender of an article answering the description is a condition precedent to the purchaser's liability; and if this condition be not performed, the purchaser is entitled to reject the article, or, if he has paid for it, to recover the price as money had and received for his use; whereas, in case of war-

ranty, the rules are very different." Benjamin, Sales (7th ed.), § 600.

The American note to the text points out the difficulty of laying down any definite rule for determining when a stipulation is a condition of the contract itself and when an independent warranty collateral to the agreement, as follows:

"In determining whether certain duties, liabilities, or stipulations, either express or implied, on the one side, are strictly conditions essential to the liability of the other party on his stipulations or promises, or are only independent and separate covenants, the breach of which may give a right of action, or counter-claim, but which does not prevent or extinguish a cause of action against the other, no other rule—worthy of the name of rule—can be laid down than that it is always a question of the intention of the parties, manifested by the expressions they have used as applied to the subject-matter of the contract, and read in the light of surrounding circumstances." American note to Benjamin, Sales (7th ed.), p. 595.

Judged by the situation of the parties and their relation to the subject-matter, it is clear that the provision for tests in the contract before us is a condition of the contract and not a collateral warranty. The terms of the contract lead inevitably to the same conclusion. An executory contract for the sale of an article tested to a given standard is a very different thing from an executory contract for the sale of an article subject to given tests. The one is a collateral warranty placing the consequences of a failure of the article to perform to the given standard upon the seller, so that the purchaser's remedy survives his acceptance. The other is a condition of the contract precedent to acceptance, placing the consequences of the failure to inspect or make the tests upon the purchaser. It furnishes its own remedy, namely, a rejection of any article not meeting the tests as not fulfilling the contract. Obviously, the remedy on such a condition precedent cannot survive acceptance. The purchaser failing to make the tests prior to acceptance has no

remedy for defects which the tests would have disclosed, in the absence of further words constituting an express warranty or circumstances raising an implied warranty that the article will be fit for the purpose for which it was purchased. *Carleton v. Lombard, Ayres & Co.*, 149 N. Y. 137, 43 N. E. 422. An executory sale subject to tests involves the same principles as an executory sale subject to inspection. The prescribed tests are but the mode of inspection appropriate to the nature of the given article. Where an executory sale is made with the provision that the article is subject to inspection, whether written into the contract or implied from the custom of the trade, such a provision is held by what we conceive to be the better considered authorities a condition precedent and not a warranty. In *Reed v. Randall*, 29 N. Y. 358, 86 Am. Dec. 305, the action was for a breach of an executory contract to sell and deliver a crop of tobacco growing on the defendant's land. The contract contained a condition that the tobacco should be well cured and boxed and in good condition. The tobacco, when delivered, was in bad condition, had not been properly cured, and was wet, sweaty and rotten. It was accepted and retained without notice to the defendant of its defects, without return or offer of return, and without any request that it be taken back. Some months after acceptance, the plaintiffs brought the action to recover damages for the failure of the article to comply with the contract. The court said:

"But the stipulation in respect to the quality and condition of the article, when delivered, constituted no express warranty. The contract was executory, for the sale of a growing crop of tobacco, to be delivered the spring following, well cured and in good condition. The article bargained for, and to be furnished in the future, was a *merchantable* crop of tobacco. This was what the vendor agreed to sell and the vendee to purchase. It was the sale of a particular thing by its proper description merely; and the descriptive words used for defining the thing agreed to be sold were of the substance of the contract, not collateral to the main object of it  .  .  .

"In cases of executory contracts for the sale and delivery of personal property, the remedy of the vendee to recover damages, on the ground that the article furnished does not correspond with the contract, does not survive the acceptance of the property by the vendee after opportunity to ascertain the defect, unless notice has been given to the vendor, or the vendee offers to return the property. The retention of the property by the vendee is an assent on his part that the contract has been performed. The delivery of property corresponding with the contract is a condition precedent to the vesting of the title in the vendee. The parties understand that the vendee is not bound to accept the property tendered, except upon this condition. This the vendee is to determine upon the receipt of the property."

It has sometimes been intimated that the foregoing decision was overruled by the same court in the case of *Day v. Pool*, 52 N. Y. 416, but we do not so read that case. In *Day v. Pool*, there was a sale of the rock candy syrup with an express warranty that it would not "crystallize or the sugar fall down." There was nothing to indicate that the sale was made subject to inspection or test. The court held the provision in the contract as to the character of the syrup an express warranty surviving acceptance and not a condition satisfied by acceptance. Referring to *Reed v. Randall, supra,* the court said: "That case would have been decided the other way had there been an express warranty as to the quality of the tobacco," thus clearly distinguishing that case rather than overruling it. The authority of *Reed v. Randall* is recognized in the comparatively recent case of *Carleton v. Lombard, Ayres & Co., supra.* In *Waeber v. Talbot*, 167 N. Y. 48, 60 N. E. 288, 82 Am. St. 712, the action was brought to recover damages for breach of an alleged warranty on an executory sale of a number of cases of "Talbot Extra Fine Peas, Sieve 23-24." It appeared that such sales were, by the custom of the trade, made subject to inspection. The plaintiffs, on delivery, accepted the goods, some ten days later discovered their defective quality, but continued to handle them for some months, when they

offered to return the remainder of the peas. The defendant refused to receive them. The court said:

"The defendants were bound to deliver the quality of goods called for by the contract, which was the highest grade they packed; and, if an inferior article was shipped, the plaintiffs had a reasonable time for inspection, rescission and offer to return. This action does not fall within that class of cases where a dealer sells an article, describing it by a name of commerce, the identity of which is not known to the purchaser, and which he cannot ascertain by inspection, and where a warranty is, therefore, implied that the article sold is that described."

After considering many decisions pointing out the distinction between a condition of the contract and a collateral warranty, the court concluded:

"Treating the general description in the case before us as a part of the contract of sale, the plaintiffs were abundantly protected; and, if they failed to inspect, rescind, and return the goods, it is because they neglected to avail themselves of the remedies which the law afforded them. In cases of executory contracts for the sale and delivery of personal property, the remedy of the vendee to recover damages on the ground that the article furnished fails to correspond with the contract does not survive the acceptance of the property by the vendee after opportunity to ascertain the defect."

It seems to us a sound rule, deducible from the authorities, that, where an executory sale is made subject to inspection, an acceptance by the buyer, with or without inspection and without notice to the seller of any defects or offer to return, is a waiver of any claim for damages on account of defects which might have been discovered upon inspection by any ordinary tests or by the tests prescribed by the contract, in the absence of an express warranty intended to survive acceptance. *Coplay Iron Co. v. Pope*, 108 N. Y. 232, 15 N. E. 335; *McCormick v. Sarson*, 45 N. Y. 265, 6 Am. Rep. 80; *Mason v. Smith*, 130 N. Y. 474, 29 N. E. 749; *Norton v. Dreyfuss*, 106 N. Y. 90, 12 N. E. 428; *Fairbank*

*Canning Co. v. Metzger*, 118 N. Y. 260, 23 N. E. 372, 16 Am. St. 753; *Savercool v. Farwell*, 17 Mich. 307; *Thompson v. Libby*, 35 Minn. 443, 29 N. W. 150; *Locke v. Williamson*, 40 Wis. 377; *Barry v. Danielson*, 78 Wash. 453, 139 Pac. 223.

In the case last cited, there was, also, an additional express guaranty which would have survived acceptance. Such acceptance is an admission that the contract has been performed (*Beck v. Sheldon*, 48 N. Y. 365), in the absence of fraud of the seller preventing or interfering with inspection by the purchaser (*Dutchess Co. v. Harding*, 49 N. Y. 321), and in the absence of latent defects not discoverable by inspection or prescribed tests. *Carleton v. Lombard, Ayres & Co., supra.*

The respondent contends that there was an implied warranty that the material furnished would be fit for the purpose for which it was purchased. It is not claimed, however, that the cement furnished possessed latent defects not discoverable by the stipulated tests, but only by actual use. The respondent, in making this contract, prescribed the tests. It must be held to have assumed, since it exacted no specific warranty of fitness, that cement meeting these tests would have met the respondent's purpose. Under the circumstances, it is clear that the specific stipulation of tests involved no warranty of what cement meeting those tests would do or produce when placed in a wall. In *Beck v. Sheldon, supra*, the defendant ordered certain iron by a specific brand and numbers for the making of stoves. The iron furnished bore those numbers and there was no evidence that it was improperly branded. The iron was delivered and used. None was returned nor a return offered. In an action for the purchase price, the purchaser claimed damages for the poor quality of iron delivered, insisting that the iron should have been suitable for the purpose intended. The court said:

"It is said that the fracture showed a grain or crystallization, and a character of iron which was not sustained by

its result when smelted. So the judge finds, and such was the evidence. He finds also that the only contract was, that Poughkeepsie pig iron Nos. 1 and 2 should be furnished, and that the pig iron, according to the contract, was duly delivered by the plaintiff to the defendants. There was, therefore, no contract either that iron should produce particular results when smelted, or that the actual result should be the same with that indicated by the fracture. On this point, also, the defendants acted upon their own judgment, receiving neither guaranty or representation from the seller. If their expectations are not realized they must themselves bear the loss."

In *International Pavement Co. v. Smith, Beggs etc. Machine Co.*, 17 Mo. App. 264, the plaintiff purchased certain boilers which the defendant undertook to deliver, tested to 200 pounds to the square inch, and furnish the testers' certificate before shipment. The certificate was furnished. The plaintiff contended that the contract implied a warranty that the boilers were reasonably fit for the purpose for which they were purchased. The court said:

"The matter of implied warranty which the plaintiff assumes is itself an integral element of the express warranty, into which it is merged, and by which its effect is circumscribed. The plaintiff's complaint is that the boilers were not strong enough—or sufficiently capable of sustaining pressure—for the purposes to which they were to be applied. It was to this specific quality of strength that the express warranty was directed, and in which the extent of the defendant's liability was limited by the words used."

While in the case just quoted the contract contained an express warranty placing the duty of testing upon the seller, we can see no reason why a sale subject to test by the purchaser would not also exclude any implied warranty as to things which the test would disclose. See, also, *Thompson v. Libby, supra.* According to the great weight of authority, there is a distinction between executory sales by manufacturers and executory sales by dealers; the rule being that, on a sale by a manufacturer, there is an implied warranty

of fitness for the purpose intended, and of freedom from defects not discoverable by ordinary inspection and tests, while on a sale by a dealer, there is no such implication, in the absence of a specific warranty to that effect. All that is required of a dealer is an exercise of good faith and fair dealing. *Kellogg Bridge Co. v. Hamilton*, 110 U. S. 108; *Farrow v. Andrews & Co.*, 69 Ala. 96; *Hoe v. Sanborn*, 21 N. Y. 552, 78 Am. Dec. 163; *Remy, Schmidt & Pleissner v. Healy*, 161 Mich. 266, 126 N. W. 202, 29 L. R. A. (N. S.) 139; *Bierman v. City Mills Co.*, 151 N. Y. 482, 45 N. E. 856, 56 Am. St. 636, 37 L. R. A. 799; *Carleton v. Lombard, Ayres & Co., supra.*

In the case before us, the appellant was not a manufacturer, but a dealer. It sold the cement subject to inspection, according to tests prescribed by the purchaser. The purchaser failed to make the tests, though it was fairly inferable from the record that it knew the appellant was not making the tests and had not tested any of the cement. It is probably true that, on a sale even by a dealer without specific warranty and not subject to inspection or test, there is an implied undertaking that the thing sold shall be reasonably fit for the purpose intended, where that purpose is known to the seller; but, on the record here, there is no room for the application of such a rule.

The authorities cited by the respondent are clearly distinguishable from the case here. In *Tacoma Coal Co. v. Bradley*, 2 Wash. 600, 27 Pac. 454, 26 Am. St. 890, there was involved a sale of bricks by the manufacturer for the construction of coke ovens. The sale was not expressly subject to inspection or test and the order for the bricks negatived any implication to that effect. It contained the caution, "I want you to be very careful about the quality. Do not send anything but what is A No. 1, and send quick as possible;" and again, "This is a trade you will want to hold and you can only do it by sending nothing but the best." The court held that the manufacturer, in filling this order,

did so under an *express warranty* of the quality of the bricks. While recognizing the rule, as sustained by the New York and Wisconsin authorities, that, in the absence of a warranty and a breach, the vendee's right to recover damages does not survive the acceptance of the property after an opportunity to discover defects, unless notice has been given to the vendor or the vendee returns or offers to return the property, the court points out the fact, which we have also noted, that this rule does not apply in cases of express warranty of quality. In that case, moreover, the evidence tended to show that there was no method of ascertaining whether the bricks were fit for the purpose intended other than actual use. Had there been some well known test, and had the purchaser bought subject to such tests without any express warranty of quality, there can be little question that the decision in that case would have been different. A review of the cases cited from other jurisdictions discloses an equal inapplicability. In *Buffalo Barb Wire Co. v. Phillips*, 67 Wis. 129, 30 N. W. 295, the defects complained of were latent defects which could not be discovered by ordinary inspection. In *Gould v. Stein*, 149 Mass. 570, 23 N. E. 47, 14 Am. St. 455, 5 L. R. A. 213, there was an express warranty that the goods should be "as per sample" and "of second quality." In *Shaw v. Smith*, 45 Kan. 334, 25 Pac. 886, 11 L. R. A. 681, there was a sale of flax seed for planting, with a stipulation that the seller would purchase the crop when grown. Whether the seed would grow or not could not be determined by ordinary inspection. It was held that there was an implied warranty that they were fit for the purpose for which they were sold.

We are driven to the conclusion that, under the contract here in question, the duty of applying the tests prescribed was upon the respondent; that the provision that the sale was subject to test was a condition precedent, the remedy upon which did not survive acceptance; and that there was

no implied warranty that the cement was fit for the purpose for which it was bought.

The appellant admits that it owes the respondent $494.76 for freight on certain of the cement from Hannibal, Missouri, to Minneapolis, Minnesota, and the further sum of $2,339.62 for sacks returned. The court found that these sums have never been paid. The respondent admits a counterclaim in favor of the appellant of $2,900. The court found this amount as $2,913.37. Eliminating from the court's findings the consequential damages which we hold under the contract the respondent cannot recover, there is apparently due to the appellant a balance of $79.

The judgment is reversed, and the cause is remanded with direction to enter judgment in accordance with this opinion.

CROW, C. J., MAIN, GOSE, and CHADWICK, JJ., concur.