**MacLEHAN v. LOFT CANDY STORES, Inc.***

No. 16535.

Court of Appeal of Louisiana. Orleans.

Feb. 8, 1937.

*Rehearing denied March 8, 1937.

H. L. Hammett, of New Orleans, for appellant.

George Piazza, of New Orleans, for appellee.

WESTERFIELD, Judge.

Miss Kathleen MacLehan brought this suit against the Loft Candy Stores, Inc., claiming damages of $2,373 for physical pain and suffering and medical expenses which is alleged to have resulted from her having eaten a portion of a mince pie that she had bought from one of defendant's confectionary stores.

Defendant, 'in its answer, denied any knowledge concerning the alleged purchase of the pie from it, but averred that, if plaintiff did purchase the pie, it was entirely fit for human consumption, having been manufactured out of the best ingredients under modern and sanitary conditions.

There was judgment below in favor of plaintiff, as prayed for, in the sum of $653.-30.

The defendant in this case was, at the time plaintiff alleges she purchased the mince pie, engaged in business in the city of New Orleans as a retail dealer in candy and confections, operating several stores. It maintained a bakery in which its cakes and pies were manufactured and from which delivery was made, upon requisition, to retail stores conducted by it. On January 4, 1935, the plaintiff, a school teacher by occupation, in company with a friend, Miss Hilda Barrett, entered one of the defendant's retail stores about 11 a. m., ordered a light breakfast consisting of toast and coffee, which she consumed on the premises, and purchased a mince pie, which was placed in a paper carton and taken home by her. Miss MacLehan had not previously eaten anything that morning because she had received communion at a Mass at the Jesuits' Church and was required by her religion to abstain from food for some time prior thereto. About 3 o'clock in the afternoon she ate a small portion of the pie, but after she had taken a few bites, she remembered that it was Friday and ate no more because the pie contained meat and her church forbade her to eat meat on Friday. She put the pie in her ice box, and about 7 o'clock that evening she became intensely nauseated and suffered great pain in her stomach and bowels and had a fit of vomiting. She took some medicine which she had at hand without apparent beneficial result. She was still sick the following day, but felt better on

Sunday, got out of bed, consumed a cup of coffee, and went to church. About 5 o'clock on Sunday afternoon she ate part of a small ham sandwich and felt better. About 7 p. m. Sunday evening, she took the mince pie out of the ice box and ate a full slice, believing that she needed more food. At 10 o'clock Sunday evening she became violently ill with cramps, diarrhea, vomiting, and excessive perspiration. She was compelled to remain in her bathroom until about 2 o'clock in the morning and "could not leave, continously vomiting, and perspiration pouring out and I could not move; I had to stay there; I couldn't get out. I didn't want to wake the roomers and I strügggled a long time until I could get back to bed." The next morning red blotches appeared on her body and she sent for Dr. Cosmo J. Tardo, who ordered her to go to Mercy Hospital, where she remained until the follwing Sunday afternoon, when she left the hospital and went to the home of a friend, Mrs. Herman Friedman, where she remained in bed for another week.

Dr. Tardo attended her while she was at the hospital and at the home of Mrs. Friedman and advised her to consult Dr. N. R. Thiberge, an expert allergist, which she did. Dr. Thiberge discovered that she was sensitive to certain forms of protein found in milk, meat, beans, and wheat, and that she was susceptible also to the protein in the air. He gave as his opinion, from the history given him by Miss MacLehan, that she had not been sensitized recently because of the absence of any previous "allergic" symptoms. Dr. Thiberge, however, in spite of Miss MacLehan's sensibility to proteins of the character found in mincemeat pies, did not believe that the small quantity of pie which she had consumed was sufficient to awaken to activity the protein sensibility to which Miss MacLehan was predisposed, saying that she might have consumed a larger quantity without ill effect if the pie had been wholesome. The mince pie which Miss MacLehan had consumed had been compounded, according to the testimony of defendant, of brown sugar, apples, raisins, citron, orange peel, currants, spices, molasses, suet, lean beef, alcohol, flour, Crisco, salt, and water.

Dr. Thiberge implies or suggests that the pie was the cause of plaintiff's illness, but he made no positive assertion to that effect.

Dr. Tardo, however, was positive in his opinion that Miss MacLehan suffered from food poisoning and from the history of the case given him by his patient he believed the mince pie was the offending food. He explained that poison food might be divided into four different classes:

"The first type, food substances to which have been added some chemical poison—for instance, arsenic—or impurities in the ingredients, or in the manufacturing. A second would be those in which some of the ingredients of the food have some intrinsic poison in them, for instance, mushrooms—certain types of food we can't classify. The third would be those in which by microbic action some decomposition has taken place prior to ingestion. The last type would be foods which carry with them certain microbes that when they get into the body cause poison symptoms. This is the classification given by Jordan who has written books on the subject."

He pointed out that when a person is sensitive to certain food the effect of eating them is manifested by a skin rash called urticaria, with which plaintiff was afflicted after having eaten the pie, but that vomiting, diarrhea, and low blood pressure are symptoms which are not present except where the allergic individual has consumed poisonous food or "food which by microbic action some decomposition has taken place prior to ingestion." Dr. Tardo also stated that in cases of food poisoning the symptoms appear soon after eating the poisonous food because "nature will attempt to get rid of the offending agent by either vomiting or diarrhea, or both, together with a loss of fluids, there are signs and symptoms of shock dehydration, the patient perspires and becomes depressed, weak, and also manifests nervous symptoms, is irritable, together with this a skin rash may appear." There is a distinction to be noted, says the doctor, between food poisoning and food intoxication. The term "food intoxication" might be applied to some chronic condition, in which the individual is sensitive to certain foods; whereas, "food poisoning is generally used for an acute condition, coming all of a sudden, causing severe symptoms."

Mrs. Friedman, plaintiff's friend, with whom she resided while ill, after leaving the Mercy Hospital, testified that she had partaken of a small portion of mince pie about a quarter of an inch square with very unpleasant results. It made her sick and left a bad taste in her mouth, a "brassy taste," for weeks afterwards. Red blotches appeared on Mrs. Friedman's body as they did on plaintiff. Mrs. Friedman's testimony, however is very unsatisfactory. When she was first placed upon the stand, she described

the effects of the small particle of pie which she had consumed as being much less severe than she did later on, when she again took the stand and elaborated upon the consequences. Mrs. Friedman either underestimated the size of the piece of pie which she consumed, or she swallowed a portion of the pie in which the noxious bacteria had concentrated for, by comparison of the quantity of pie said to have been consumed by the two ladies, Miss MacLehan who ate one-eighth of the pie, as against Mrs. Friedman's one-quarter inch square, would have died immediately if her piece had been as potent for evil as Mrs. Friedman's portion.

On behalf of defendant, its general manager and its head baker testified that all of the ingredients which went into the manufacture of its mince pie were of the first quality and that the conditions surrounding their manufacture were ideal and modern in the extreme. The particular pie which defendant purchased was baked the same day she bought it. The mincemeat, however, had been made up in a batch weighing 300 pounds about fifteen days before and had been kept in a refrigerator in a wooden barrel in the meantime. Mincemeat, it is said, will keep indefinitely due to its alcoholic content. No person who purchased any of the 300 pies made up from the same batch had complained to defendant of its quality.

Dr. Alix Ficklen, who testified as an expert for defendant, was of opinion, after interviewing Dr. Tardo and Dr. Thiberge, that plaintiff's illness was not due to the defendant's pie, or at least not due to any unwholesomeness in the pie, but to her susceptibility to various proteins which the pie contained. But he agreed with Dr. Tardo that in cases of food intoxication due to allergy such symptoms as cramps, diarrhea, vomiting and low blood pressure do not occur. Miss MacLehan, Dr. Ficklen believes, was suffering from urticaria, or angioneurotic edema caused by indulgence in food to which she was sensitive. He stated that the incubation period of food poisoning might easily be 72 hours after the ingestion of the food, or even as much as three weeks, though it might occur two hours later.

■ On the whole we believe that plaintiff has established causal relation between her consumption of the mincemeat pie and her illness which is not explained by her predisposition or sensitiveness to the proteins which the pie contained, and inconsistent with a finding of wholesomeness of the pie when she purchased it. We cannot explain the failure of other purchasers of pies from the same batch of mincemeat to complain of their quality. It may be that they suffered only slight digestive disturbance due to gastronomical indifference to the many ingredients, singly and in combination, which make up that most formidable comestible, the mincemeat pie, an omnium gatherum for which our reading of this record has given us an increased respect not unmingled with awe. But in any event, not even a mincemeat pie, unless it be in a more or less advanced state of putrefaction or decomposition, though consumed by a purchaser with systemic hostility to its elements, could, or should, produce such immediate and violent intestinal repercussions, as have been proven to follow the plaintiff's indulgence in defendant's pie. The testimony of all of the medical experts supported this conclusion which, to the lay mind of this court, seems most reasonable.

■ A vendor of unwholesome food is presumed to know its condition and is liable in damages to a purchaser who is made ill as a result of its consumption. Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906, 40 L.R.A.(N.S.) 480, Ann.Cas.1913B, 1110.

■ There is an implied warranty in every sale. The vendor guarantees the vendee against the hidden defects of the thing sold. R.C.C. arts. 1764, 2520 et seq. The rule is different at common law where the maxim "caveat emptor" applies to sale of personal property in the absence of expressed warranty. However, the Supreme Court of the United States in Kellogg Bridge Company v. Hamilton, 110 U.S. 108, 3 S.Ct. 537, 28 L.Ed. 86, as pointed out by this court in Doyle v. Fuerst & Kramer, 8 Orleans App. 408, held: "That a party, holding himself out as having requisite skill and special knowledge of its own workmanship, should indemnify its vendee against latent defects which the latter could not by inspection have discovered for himself." Quoted from opinion of Doyle v. Fuerst & Kramer, 8 Orleans App. 408, at page 410.

In George v. Shreveport Cotton Oil Company, 114 La. 498, 503, 38 So. 432, 434, our Supreme Court said:

"Laurent [Vol. 24, Nos. 295, 296] is of the opinion that, even where the seller is in good faith, the purchaser can claim damages from him in the particular class of cases under the circumstances to which he refers. * * * We are of the opinion that the doctrine announced in [Kellogg Bridge Co. v. Hamilton] 110 U.S. [108] 3 S.Ct. [537]

28 L.Ed. [86] (the same as that expressed by Laurent) is conservative, and that a manufacturer who disposes of the things which he himself has manufactured can properly and legitimately be held presumptively to a knowledge of the qualities of the things he sells; and we apply that presumption to the case before us."

Having found that the pie purchased by plaintiff was unfit for human consumption, it follows from the application of the authorities which we have cited to the facts of this case that the defendant is presumed to have known the condition of the pie prepared by it and is liable for the damage caused by its latent defects.

The quantum does not appear to be in controversy, and we see no reason to disturb the award.

For the reasons assigned the judgment appealed from is affirmed.