GREEN MOUNTAIN MUSHROOM COMPANY, INC. *v.* CECIL BROWN
ET ALS.

(95 A2d 679)

Special Term at Rutland, November, 1952.

Present: SHERBURNE, C. J., JEFFORDS, CLEARY, ADAMS and CUSHING, JJ.

Opinion Filed February 3, 1953.

510

*Osmer C. Fitts* and *Philip H. Suter* for the plaintiff.

*James B. Campbell* and *Lawrence & O'Brien* for the defendants.

CUSHING, J. This is an action in contract for recovery of damages to a building and loss of crops and profits due to an alleged breach of an implied warranty of fitness of a roofing cement used in the construction of plaintiff's mushroom growing building. Trial was by jury which resulted in a verdict for the plaintiff. Plaintiff moved for judgment on the verdict. Defendant moved to have the verdict set aside and for judgment notwithstanding the verdict. This motion was granted and judgment entered for the defendant, with exceptions to the plaintiff.

The cause is before this Court on plaintiff's exception to the court's setting aside the verdict and granting judgment for the defendant, n.o.v. and on defendant's exceptions to the court's charge, failure to charge as requested, and to the admission of certain evidence.

■ Viewing the evidence in the light most favorable for plaintiff, as we must on defendant's motion to set aside the verdict and for judgment n.o.v., *Johnson* v. *Hardware Mutual Casualty Co.,* 109 Vt 481-499, 1 A2d 817 ; *Farrell* v. *Greene,* 110 Vt 87, 89, 2 A2d 194, the jury could have found the following facts.

The plaintiff is a Vermont corporation engaged in the growing of mushrooms in Manchester. The defendants are partners doing business as Brown and Hitchcock in Manchester, engaged in the business of selling building supplies. In January 1950 the plaintiff started the construction of a mushroom growing plant. During the period of construction Mr. Jennings, president and treasurer of the corporation, discussed with the defendants the matter of the materials to be used. After independent study the corporation decided on Reynold Rey-Kool roofing as the material to be applied to the roofs of its buildings and procured it through the defendants. It was purchased by its trade name Rey-Kool.

In order to apply the roofing an adherent was necessary. Mr. Jennings told Mr. Brown or Mr. Hitchcock the kind of a building the corporation was erecting : that it would accept 60 rolls of Rey-Kool roofing "along with the proper materials with which to apply it," to be delivered when ready for the application; that at no time was it ever suggested by him that Barrett S. I. S. roofing cement should be delivered.

Mr. Ostrander, the corporation's manager, informed Mr. Brown

that a cement would be necessary and wanted to know what they carried for half lap roofing; that Brown told him that the most common type used was Barrett S.I.S.; that there were other types, that there was a plastic cement which could be troweled on or the S.I.S. and in his opinion from what he knew of half lap roofs that the S.I.S. cement would be the one to use; that he knew the purpose for which the cement was to be used, that Mr. Ostrander asked what Brown thought ought to be used, that Brown's opinion was that it would do the job they wanted done. Mr. Ostrander gave an order for the material suggested and that he did not ask for it under the name S.I.S.; that Brown suggested it was a good product to use and a proper one. Barrett S.I.S. cement was not a proper cement to use on Rey-Kool roofing, but that the adherent should have been hot asphalt.

The roofing was completed about the 16th of June. Sometime in early September it was noticed that the aluminum lamination on the Rey-Kool was beginning to peel from the asphalt backing and some pieces had blown away, that the roof continued to peel all over. As a result there was continual leakage into the building which resulted in the damaging of the insulation of the side walls, and the grey-lite boards on the ceilings and roof. The leakage damaged the growing crop of mushrooms to such an extent that the bins in which they were cultivated had to be emptied and the crop destroyed, that production was diminished because of the water and moisture from the leaking roof, and the development of certain diseases affecting the mushrooms.

The question presented by plaintiff's exception is, was the sale of Barrett's S.I.S. cement under an implied warranty of fitness?

Subdivisions I and IV of V. S. 47, § 7868 (Uniform Sales Act) read as follows:

"I. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, (whether he be the grower or manufacturer or not) there is an implied warranty that the goods shall be reasonably fit for such purpose."

"IV. In the case of a contract to sell or a sale of a specified article under its patent or other trade name

there is no implied warranty as to its fitness for any particular purpose."

Plaintiff's contention is that the sale of the S.I.S. cement falls within the provisions of subdivision I of § 7868 whereas defendant claims that it falls within the provisions of subdivision IV.

■ V. S. 47, § 7927 reads as follows:

"This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states which enact it."

In view of this section decisions of the highest courts in other states having adopted the Uniform Sales Act, involving its interpretation or construction, are precedents by which we are more or less imperatively bound in cases where similar questions are presented. *Aetna Chemical Co.* v. *Spaulding and Kimball Co.,* 98 Vt 51, 59, 126 A 582; *Breding* v. *Champlain Marine and Realty Co.,* 106 Vt 288, 300, 172 A 625.

■ The implied warranty of fitness is not founded on negligence. *Ireland* v. *Louis K. Liggett Co.,* 243 Mass 243, 137 NE 371.

■■ The raising of an implied warranty of fitness depends upon whether the buyer informed the seller of the circumstances and conditions which necessitated his purchase of a certain character of article or material and left it to the seller to select the particular kind and quality of article suitable for the buyer's use. This is the rule regardless of whether the case is governed by the common law or the Uniform Sales Act, except that under the Uniform Sales Act a dealer is placed under the same responsibility as a manufacturer and the term "trade mark" or "trade name" is used, rather than the term "specified, described article." So when the buyer orders goods to be supplied and trusts to the judgment or skill of the seller to select goods or material for which they are ordered, there is an implied warranty that they shall be reasonably fit for that purpose. *Davenport Ladder Co.* v. *Edward Hines Lumber Co.,* 43 F2d 63. *George E. Pew Co.* v. *Karley,* 168 Iowa 170, 150 NW 12, 13, was an action to recover the purchase price of an electric generator installed by plaintiff in defendant's place of business for the purpose of operating a motion picture theater. The generator failed to produce adequate electricity to operate the machines and illuminate

the premises. In affirming the lower court's judgment for the defendant the court says:

> "If a person goes to the manufacturer or dealer describing the kind of work to be done or the result to be accomplished and the dealer professes to be able to supply an engine or machinery which will do it, and the buyer is thereby induced to give him an order therefor, there is a warranty that the thing so furnished is reasonably adapted to the work for which it is procured, even though the order particularly defines and describes it."

*Sachter* v. *Gulf Refining Co.,* 203 NYS 769, is a case very much in point. According to the proof adduced by plaintiff, a representative of plaintiff was advised by defendants' salesman, when plaintiff required oil for its refrigerating plant, to order of defendant Choctaw oil. Thereafter plaintiff's representative stated to defendants' manager that defendants' salesman had told plaintiff's representative that the kind of oil for plaintiff to use was Choctaw oil, and defendant's manager told plaintiff to order it. It was accordingly ordered and after being used was found to be unfit for the purposes required. While the sale of the oil was under a trade name it appears that this was done at the instance of defendant's salesman, who answered plaintiff's representative about the fitness of the oil for the purposes required by plaintiff. The buyer relied, not upon the trade name, but upon the statement of the seller's representative, which was communicated to defendant's manager. The examination of plaintiff's plant by defendants' representative, and the advice given to plaintiff that Choctaw oil was the oil to use, and the statement by plaintiff's representative to defendants' manager that defendants' salesman had told plaintiff's representative that Choctaw oil was the oil to use, and the manager's statement to plaintiffs' representative that plaintiff should order that kind of oil, indicates that plaintiff made known to defendant the purpose for which the oil was required, and that the plaintiff relied on defendants' skill with reference to the use of the oil. Thus there was an implied warranty that the oil should be reasonably fit for such purposes.

The rule of implied warranty of fitness was a part of our com-

mon law long before the enactment of the Uniform Sales Act. In *Wing* v. *Chapman,* 49 Vt 33, 35, the principle was enunciated and applied. The Court said :

> "Even without any express warranty in this class of contracts, the law has now become pretty well settled, that where the special purpose of the buyer is made known to the seller, and the seller, with such knowledge, delivers the goods, the law implies that they are reasonably fit for the purpose specified. If the facts show that the buyer trusts to the judgment of the seller, the seller must see to it that he judges correctly. * * * it is now settled that it applies generally in all sales of property for a special purpose, if the sale is made on the judgment and skill of the vendor."

*Pease* v. *Sabin,* 38 Vt 432, 435 was an action for breach of warranty of soundness of quality of cheese bought for export. The cheese proved to be unsound and maggoty. From a verdict and judgment for the defendant the plaintiff appealed.

In reversing the judgment this Court said : "The principle seems to be now well settled by the authorities, that when the manufacturer of an article sells it for a particular purpose, the purchaser making known to him at the time the purpose for which he buys it, the seller thereby warrants it fit and proper for such purpose, and free from latent defects. The law therefrom implies a warranty of the fitness of the article for the purpose."

By the provisions of V. S. 47, § 7868, subd. I, it is enacted that the implied warranty attaches whether the seller be the grower or manufacturer or not.

In *Beals* v. *Olmstead,* 24 Vt 114, 116, the doctrine of implied warranty in the sale of hay was invoked where the hay purchased was for a particular use and the vendor knew that the vendee would not buy an inferior article.

From the evidence in this case the jury could reasonably find that the plaintiff informed the defendants that a cement was required to use in applying Rey-Kool roofing to its mushroom growing building, that a highly reflecting roof was necessary in order to reflect the sun's rays to control the temperature and humidity within the building. Mr. Brown, one of the partners, informed plaintiff's

manager that Barrett S.I.S. cement would do the job, that it was a good product to use and a proper one. Acting upon this information and in reliance on the judgment of the seller the cement was purchased and used on the roof. It proved to be the wrong adherent and the roof went to pieces.

Defendants' contention is that notwithstanding the rule of implied warranty of fitness, as set forth in subdivision I of V. S. 47, § 7868, the sale of the cement was "of a specified article under its patent or other trade name" and that under the provision of subdivision IV of V. S. 47, § 7868, there was no implied warranty of its fitness.

That the article sold had a trade name S.I.S. there is no dispute. The general rule is that if an article known under a patent name or trade-name is ordered and furnished, there is no implied warranty for a particular purpose, since the buyer received what he bargained for. However, the fact that an article has a trade name does not of itself necessarily preclude the existence of an implied warranty of fitness for a particular purpose. Such a warranty may exist where, although the article has a trade name, the purchase is not made by, or in reliance on the name, but is made for a particular purpose and supplied for that purpose, in reliance on the seller's judgment. 77 CJS 1181-1182, § 325 (c).

The courts of other states, whose holdings "are precedents of more than persuasive authority," *Aetna Chemical Co.* v. *Spaulding and Kimball Co.,* 98 Vt 51, 59, 126 A 582,585, have interpreted this subsection IV of the Uniform Sales Act as has the Supreme Court of Minnesota in *Iron Fireman Coal Stoker Company* v. *Brown,* 182 Minn 399, 400, 234 NW 685. The Court says:

> "If a person requests a dealer to deliver him a specifically designated article, known to the buyer and the trade by its trade-name, and it is done, it is obvious that the article would be sold under its trade-name within the meaning of the statute. Such negotiation indicates that the article is known by both parties and the buyer has designated just what he wants. He knows what he wants. The theory of the statute is that since he knows what he wants and gets it, after having so designated it, it must be supposed that the trade-name carries such qualities as to cause

the purchase. The spirit and intent of subd. 4 of the statutes is that the seller is not held to an implied warranty because the buyer gets the distinct thing selected by him, an exact article, for which he bargains. So, acting on his own desires, he takes his own chances as to the fitness of the article and should not be permitted to complain of the seller, who has supplied him with the very thing he sought. Or to state it another way, if the thing is itself specifically selected and ordered, the buyer takes upon himself the risk of its effecting the desired purpose. Under such circumstances the law does not impose an implied warranty; nor should it. The situation is quite different where the buyer yields to the trade talk of a salesman who sells him something that is wholly unknown to him. Perhaps it might be said that where the buyer selects the article subd. 4 applies; and where the seller selects the article suitable for the purposes needed subd. 1 hereinafter mentioned applies. We are of the opinion that where the buyer fully informs the seller of his particular needs and the seller undertakes to select or supply an article suitable for the purpose involved, subd. 1 applies even though the article may be described in the contract of sale by its trade-name."

To the same effect is the holding in *J. A. Campbell Co.* v. *Corley,* 140 Ore 462, 3 P2d 776, 13 P2d 610, 613, 14 P2d 455, where the court said:

"A buyer who asks for an article under its trade-name, thereby indicating that he knows what he wants and does not rely upon the skill of the vendor, is not the beneficiary of any warranty except one that demands that the article delivered shall be merchantable and the kind specified. * * * The rule of law just stated is applicable even though the purchaser when buying states the purposes to which he expects to apply the article. But the mere fact that the article happens to have a trade-name and is denoted by it in the contract does not exclude all warranties and assign the

transaction to sub-division 4 of section 64-315, Oregon Code 1930."

■ To begin with it must appear that the goods were known in the market among those dealing in that kind of merchandise by its trade-name. *Barrett Co.* v. *Panther Rubber Mfg. Co.,* 24 F2d 329 ; *Universal Motor Co.* v. *Snow,* 149 Va 690, 140 SE 653, 59 ALR 1174. If the circumstances of the transaction show that the buyer made known to the vendor the purpose for which he desired the article, relied upon the seller's skill and judgment, and that the trade-name was inserted in the contract merely for convenience of description, an implied warranty of fitness arises for the protection of the buyer, in the absence of a clause of disclaimer, even in jurisdictions where the Uniform Sales Act has been adopted.

Both plaintiff and defendants call to our attention the case of *Aetna Chemical Co.* v. *Spaulding & Kimball Co.,* 98 Vt 51, 126 A 582, 583. The facts in that case are entirely different from those in the instant matter. There the contract was in writing, the goods ordered as 60 cartons, each of 4 dozen "Wonder Window Washer (Small)" and 15 cartons, each of 2½ dozen, same kind of goods "(Large)." The contract bore the plainly printed provision "No promise valid unless written on this order."

In discussing the applicability of the provisions of the "Uniform Sales Act," in so far as it applied to the implied warranty of fitness this Court held at page 60 that where a sale is made of an article under its patent or trade name there is no implied warranty of its fitness for any particular purpose, whether the buyer makes known to the seller the particular purpose for which the goods are required or not. The court held, at page 58,

"There was no error in the ruling that the sale was not by sample and did not fall within the provisions of § 16 (sale of goods by sample) ; nor was there error in the holding that the sale was of a specified article under its trade name and so, by subdivision (4) of § 15, (V. S. 47, § 7868) carried with it no implied warranty as to the fitness of the goods for any particular purpose (cases cited), unless the fact that the buyer made known to the salesman the particular purpose for which the goods were required, and relied on his judgment—an element not mentioned in subdivi-

sion (4) but which is explicitly stated in sub-division (1) is such a distinctive feature as to make the provisions of the latter, implying a warranty, rather than those of the former, applicable in the circumstances of this case."

From what we have said above with respect to the Court's holding it is apparent that it held that the imparting to the salesman the particular purpose for which the goods were required was not such a distinctive feature as to make the provisions of subdivision (1) rather than those of subdivision (4) applicable.

It is apparent from our statement of what the evidence tended to show that the jury could reasonably find that the purchase of the adherent was not made by or in reliance on its trade name of Barrett S.I.S. cement but was made in reliance on the seller's judgment.

While not made a ground to set aside the verdict and for judgment n.o.v. both parties have briefed and argued the necessity of superior knowledge on the part of the seller.

■ The jury may infer from the evidence in a case that the buyer, being ignorant of the fitness of the article offered by the seller, justifiably relied on the superior information, skill and judgment of the seller and not upon his own knowledge or judgment; and that under such circumstances an implied warranty of fitness would be properly claimed by the purchaser. *Universal Motor Co.* v. *Snow,* 149 Va 690, 140 SE 653, 59 ALR 1174.

In *Bristol Tramways and Carriage Co.* v. *Fiat Motors,* 2 KB (Eng) 831, where the buyer of certain omnibuses informed the seller they were required for a certain character of traffic, this statement was held sufficient to show that the buyer relied on the seller's skill or judgment, without any further evidence on the point. *Hoe* v. *Sanborn,* 21 NY 552, cited by defendant is not in point as this was predicated upon the fraud of the seller. The implied warranty of fitness does not depend on fraud. 77 CJS 1177, § 325. *Kellogg Bridge Co.* v. *Hamilton,* 110 US 108, 3 S Ct 537, 543, 28 L Ed 86, was an action predicated upon the insufficiency of false work erected by the Kellogg Bridge Company which was not suitable and proper for the purposes for which it was to be used by defendant. The defect was a latent one and the court held that where the seller is the maker, the fair presumption is that he understood the process of manufacture, and was cognizant of any latent defect caused by such

process and against which reasonable diligence might have guarded. This case does not afford the defendant any aid as the holding, as expressed by the court, is:

> "When, therefore the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture."

*Bigelow* v. *Maine Central R R Co.,* 110 Me 105, 85 A 396, 43 LRANS 627, was an action to recover for injuries incident to eating defective canned asparagus. Because both plaintiff and defendant knew that the article was a can of asparagus; that it was known as The Red Label Brand; that it was put up by S. S. Pierce Co; that it was guaranteed by the pure food act; and that neither could discover any imperfection in the contents of the can, it was held by the court that both had the same knowledge about the article.

The cases cited by defendant in which liability on the part of the seller was denied are not in point as they are all predicated on a peculiar physical condition, *Zager* v. *F. W. Woolworth,* 30 Cal App 2d 324, 86 P2d 389; or an allergy, *Ross* v. *Porteous, M & B Co.,* 136 Me 118, 3 A2d 650; *Gould* v. *Slater Woolen Co.,* 147 Mass 315, 17 NE 531; *Walstrom Optical Co.* v. *Miller,* Tex Civ App, 59 SW2d 895, dye in glasses frames.

It was error for the court to set aside the verdict and enter judgment n.o.v. for the defendant. Plaintiff's exception is sustained.

Defendant briefs two exceptions to the court's failure to charge as requested and to the admission of certain evidence.

The defendant requested the court to charge: "2. That if the jury finds that the plaintiff ordered and purchased Barrett's S.I.S. cement from the defendant by its trade name, there is no warranty by the defendant as to its fitness for the plaintiff's purpose, even though the plaintiff may have made known to the defendant the particular purpose for which Barrett's S.I.S. cement was to be used."

Defendant Brown testified that Mr. Ostrander gave Brown an order for the material that he had suggested Ostrander use. "He gave me an order for S.I.S. cement." In answer to the question

"He didn't ask for S.I.S. until it was suggested, did he?" Answer: "He didn't ask for it by that name, no, sir." The evidence is clear, then, that the plaintiff did not order the cement from the defendants by its trade-name and the court's refusal to charge as requested was not error, since there was no conflicting evidence.

The defendant further requested the court to charge as follows:

"6. That there is no competent evidence of the amount of crop damage claimed to have been suffered by the plaintiff as a result of the alleged defects in the roof, and even though the jury finds for the plaintiff it cannot award damage for crop loss."

The court charged as follows:

"Now, we also have one other item which plaintiff seeks to recover on and that is loss of mushroom crops. Now, without going into detail you ladies and gentlemen no doubt have in mind the piece of paper which was introduced as an exhibit disclosing what the production was over a period of months. You also have in mind the testimony of witnesses introduced by the plaintiff as to the picking season and the growing season, the length of time it takes to develop mushrooms suitable for picking. Now regarding the other items which I have just indicated to you, if you find for the plaintiff as part of its cost it is entitled to the damage to the crops of the plaintiff. Now that does not mean prospective profits because there is insufficient evidence here we feel to predicate any claim upon profit because profit represents just what it says,—profit—and there is no evidence in this case showing what the cost of production was. So, if you find for the plaintiff and also find on this particular item as to the crops you are limited as to the value of the crops which you find were destroyed and those crops, I believe it was stated and I think you can justifiably find from the evidence, from the testimony that at the time the mushrooms during that period were being sold for, I believe around 40 cents a pound. The evidence indicates from this sheet of

paper just what the production was over each month for a given period of time. The plaintiff has introduced some testimony as to what production would have amounted to. I believe the term 10,000 pounds was used. Just what is meant by that if there is any doubt the plaintiff claims that represented 10,000 pounds per month. But if there is any doubt in your mind you have a right to resort to the record. There is probably something you should also consider on this one question as to the quantity of crops that were destroyed as claimed by the plaintiff."

The defendants' exception was in the following language:

"Upon the ground that there is no sufficient competent evidence upon which the jury could reasonably predicate the verdict of loss of crops or damage to loss of crops. The only evidence in that respect being the evidence disclosed by witness Ostrander who referred to the destruction of a possible 10,000 pounds, the period during which the claimed destruction doesn't appear in the evidence and without some sufficient basis and groundwork having been laid for the submission of that question to the jury any verdict seeking to award damages for crop damage would necessarily be predicated· upon conjecture and guess and without any basis in law and consequently it was erroneous for the court to charge as the court did in that respect."

With respect to the damage to the mushroom crop the evidence tended to show the following facts: That water dripped from the roof onto the growing trays resulting in a complete destruction of the mushrooms in the trays; that disease was caused by the excessive moisture affecting the entire growing area; that the production of mushrooms is figured on the area devoted to their growth; that in plaintiff's plant the area used would produce 10,000 pounds a month; that the growth and harvesting of a crop is a .continuous process covering a period of sixty days; that the maximum of 10,000 would have been reached in September 1950 had it not been for the moisture and disease; that the pounds harvested in September was

4576 and in October 4243; that the average wholesale price of mushrooms was 40 cents a pound.

There was no evidence to show the amount of the mushrooms destroyed by the water dripping onto the growing trays, or of the decrease in the number of pounds caused by the disease. The only figure given in evidence was that the average wholesale price of mushrooms was 40 cents a pound. With only the wholesale price of 40 cents in evidence, with no evidence as to the weight of the crop destroyed, or damaged, the jury could only speculate as to these elements of damage. Defendants' exception is sustained.

The defendants' third exception is to the admission of evidence concerning damage to fiber glass insulation.

Witness Ostrander was asked in direct examination:

> "Have you had occasion to observe whether or not there's been any damage to the fiber glass insulation?"

To which he replied:

> "No. I haven't been able to get into it."

He was further inquired of as to whether or not he had had experience with fiber glass insulation before and whether he had had occasion to observe the effect of moisture on the paper covering on fiber glass insulation to which he replied that he had.

He was then asked:

> "Have you made an examination of the fiber glass insulation in the ceilings of rooms 3, 4 and 5?"

to which he replied:

> "I have not."

Ostrander was then asked "Have you some opinion as to the condition of the fiber glass insulation in rooms 4, 5 and 6?" To which he answered "Yes," and he was then asked, "What is that opinion?" Answer "50%."

This line of testimony was timely objected to on the ground that no sufficient foundation had been laid for it, and that it was irrelevant, immaterial and incompetent. Exceptions were allowed on all grounds.

In this connection it is to be noted that the witness had not observed whether or not there had been any damage to the fiber glass insulation, as he had been unable to get into it, and that he had not made an examination of the material in the rooms specified.

The damage claimed by the plaintiff to have been occasioned by the act of the defendant was a material part of the case and the extent of the damage to the insulation made up a portion of that damage.

Wigmore in Chapter I, in discussing the three groups of rules relating to testimonial evidence states that the rule requiring personal observation by the witness' own senses is a healthy rule—"no wiser or safer was ever devised." In the instant case the personal observation of the witness was nil; he had not seen any of the matter or things concerning which he was allowed to testify.

In *Evans* v. *People*, 12 Mich 27, 35, the court says:

> "The primary rule, concerning all evidence, is, that personal knowledge of such facts as a court or jury may be called upon to consider, should be required of all witnesses, where it is attainable."

Where probative force of evidence is so weak that it raises only a surmise or suspicion of existence of fact sought to be established, the evidence is no "evidence" at all in legal contemplation, and will not support a finding which comprehends the existence of the disputed fact. *Houston Fire and Casualty Co.* v. *Biber*, Tex Civ App, 146 SW2d 442, 446.

"Evidence" is that which tends to produce conviction in the mind as to existence of a fact. *Magazine* v. *Shull*, 116 Ind App 79, 60 NE2d 611, 613.

When Ostrander testified that he had not been able to get into the fiber glass insulation and that he had not made an examination of the insulation in the ceiling of rooms 3, 4 and 5, his testimony as to the condition of the insulation was a mere guess; its admission was reversible error.

The only errors affecting the verdict were as to the damages. From a reading of the transcript we are convinced that the jury by its verdict settled the issue of liability fairly and upon sufficient evidence so that disassociated from other questions it ought to stand as the final adjudication of the rights of the parties. Consequently the cause will be remanded for a retrial upon the issue of damages only.

*The order setting aside the verdict and the judgment for the defendant notwithstanding the verdict are reversed, and judgment upon the verdict is entered for the plaintiff upon the issue of liability. The verdict as to damages is set aside and the cause remanded for a retrial on that issue only.*